**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1710
_____

WILLIAM MURPHY, individually and as guardian ad litem on behalf of A.T. and
K.M.; TANISHA MURPHY,
Appellants

v.

STATE OF DELAWARE, JUSTICES OF THE PEACE; THE HONORABLE ALAN
DAVIS, in his official capacity only as Chief Magistrate of the Justices of the Peace;
CONSTABLE HUGH CRAIG, individually and in his official capacity as a Constable of
the Justices of the Peace; CONSTABLE JAMAN BRISON, individually and in his
official capacity as a Constable of the Justices of the Peace; CONSTABLE GERARDO
HERNANDEZ, individually and in his official capacity as a Constable of the Justices of
the Peace
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1:21-cv-00415)
District Judge: Honorable Colm F. Connolly
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on March 6, 2025

Before: MATEY, FREEMAN, and ROTH, *Circuit Judges*

(Opinion filed: October 8, 2025)

_____

OPINION*
_____

FREEMAN, *Circuit Judge*.

In February 2021, three constables from Delaware's Justices of the Peace Court ("JP Court") evicted William Murphy and his two minor daughters from the apartment they rented in Wilmington ("the Apartment"). Murphy—who is observably blind—had a valid lease to occupy the apartment. He showed the constables his lease and told them he had not received notice of the eviction. The constables had posted a written notice days earlier, but it was not readable by a blind person. The notice also listed the name of a prior tenant, not Murphy.

The Murphy family sued the constables and the JP Court for disability discrimination and constitutional violations, and the District Court dismissed the claims. For the reasons that follow, we will affirm the District Court's order in part, vacate it in part, and reverse it in part.

**I**

Kenneth Stanford owns the Apartment and previously leased it to Viola Wilson. After Wilson vacated the Apartment, Stanford leased it to Murphy. Murphy's one-year lease commenced in November 2020. Murphy's adult daughter, Tanisha Murphy

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

("Tanisha"), co-signed the lease but lived elsewhere. Murphy, who is a widower, lived in the Apartment with his two minor daughters.

Stanford knew Wilson had vacated the Apartment and that the Murphys occupied it under a valid lease. Nonetheless, Stanford filed an eviction action against Wilson as if she still occupied the Apartment. He did so without providing notice to the Murphys (the actual tenants) as required by Delaware Law. *See* 25 Del. C. §§ 5502, 5704–07.

Stanford obtained a final judgment against Wilson in February 2021. He then caused the JP Court to issue a writ of possession. Such writs "direct[] . . . the constable . . . to remove all persons" from a specific property and to put the owner "into full possession" of the property. 25 Del. C. § 5715(a).

Upon the issuance of a writ of possession, Delaware law requires constables to "give at least 24 hours' notice to the person or persons to be removed" from a property. *Id.* at § 5715(b). According to reports written by several constables, a notice to Wilson was posted on the Apartment door on February 5.

On the morning of February 11, three constables (Defendants Craig, Brison, and Hernandez) arrived at the Apartment to execute the writ. They spoke to Murphy, who was at home with his minor daughters. The constables observed that Murphy was blind and acknowledged that he was not Viola Wilson, the person named in the eviction order.

When Murphy provided his lease to the constables, one of the constables accused him of making it up. The constables also called their supervisor for guidance. The supervisor told them to remove all persons from the Apartment, and he said those persons later could challenge the eviction order in court.

3

The constables gave the Murphys thirty minutes to vacate the Apartment and left them on the street during a snowstorm.  The Murphys were forced to leave behind most of their possessions, including an urn containing the ashes of Murphy's late wife (his daughters' mother) and the laptop computers his minor daughters were using for their schooling (which was fully remote due to the COVID-19 pandemic).  One of the constables assured the others, "If anything goes wrong, I will take the fall for it."  App. 138.  The constables informed Murphy that his only recourse would be to file a complaint for wrongful eviction in the JP Court.

The Murphys did just that.  One week after the eviction, the JP Court held an emergency hearing and ruled in the Murphys' favor.  The JP Court castigated Stanford's actions in abusing the resources of the court, and it referred the matter for a criminal investigation.  It also gave the Murphys the option of moving back into the Apartment or terminating the lease.  Due to a deep distrust of Stanford, they chose the latter option.

The Murphys later filed this lawsuit.  They brought claims against the JP Court and the JP Court's Chief Magistrate Alan Davis under Title II of the Americans with Disabilities Act ("Title II") and Section 504 of the Rehabilitation Act ("Section 504").  They also brought claims under 42 U.S.C. § 1983 for due process violations and unconstitutional seizure, seeking relief from the JP Court, Magistrate Davis, and the three constables who carried out the eviction.[1]

---

[1] The Murphys also sued Stanford, who reached a settlement with the Murphys and was subsequently dismissed from the case.

The District Court dismissed all claims for failure to state a claim. It held that the Murphys did not state Title II or Section 504 claims because they did not plausibly allege a causal link between the JP Court's or Magistrate Davis's challenged conduct and Murphy's disability (blindness). It also held that the Murphys did not plausibly allege an ongoing violation of a federal right that could support the official-capacity claims against Magistrate Davis or the constables, and it held that constables had quasi-judicial immunity from the Murphys' individual-capacity claims.[2] The Murphys timely appealed.

## II[3]

We exercise plenary review of an order granting a motion to dismiss for failure to state a claim. *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 486 (3d Cir. 2017). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That is, the complaint's allegations must enable "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Therefore,

---

[2] Because the Murphys "d[id] not dispute . . . that the JP Court is an arm of the state and is therefore not a person under § 1983," the District Court also dismissed the § 1983 claims against the JP Court. App. 17; *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989) ("Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties."). On appeal, the Murphys have not presented any argument challenging this determination.

[3] The District Court exercised subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291.

considering the elements required to prove a complaint's claims, we must determine whether the well-pleaded, non-conclusory allegations "plausibly give rise to an entitlement for relief." *Hassen v. Gov't of V.I.*, 861 F.3d 108, 115 (3d Cir. 2017).

A

Title II of the ADA "forbids any 'public entity' from discriminating based on disability." *Fry v. Napoleon Cmty. Sch.s*, 580 U.S. 154, 159 (2017) (quoting 42 U.S.C. §§ 12131–12132). Title II is implemented by a regulation that "requires a public entity to make 'reasonable modifications' to its 'policies, practices, or procedures' when necessary to avoid such discrimination." *Id.* at 159–60 (quoting 28 C.F.R. § 35.130(b)(7) (2016)).

Section 504 of the Rehabilitation Act "applies the same prohibition" as Title II "to any federally funded 'program or activity.'" *Id.* at 159 (quoting 29 U.S.C. § 794(a)). It requires "certain 'reasonable' modifications to existing practices in order to 'accommodate' persons with disabilities." *Id.* at 160 (quoting *Alexander v. Choate,* 469 U.S. 287, 299–300 (1985)).

To state a claim under Title II or Section 504, a plaintiff must show: "(1) he is a qualified individual; (2) with a disability; (3) who was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability." *Williams v. Sec'y Penn. Dep't of Corr.*, 117 F.4th 503, 527 (3d Cir. 2024) (cleaned up); *see Durham v. Kelley*, 82 F.4th 217, 225 (3d Cir. 2023) ("The elements of a claim under [Section 504] are the same [as Title II], except that the plaintiff must also show that the program in question received federal dollars."). While Title II requires only but-for

6

causation for a prima facie case, Section 504 requires that a plaintiff's disability "be the sole cause" of the discrimination.[4] *Durham*, 82 F.4th at 226.

B

The Murphys have plausibly pleaded that Murphy's blindness led the defendants to evict them without notice readable by a blind person. Accordingly, we will vacate the order dismissing the Murphys' Title II and Section 504 claims on causation grounds.

The constables gave Murphy written notice of the eviction that Murphy could not read because of his blindness. Despite knowing this, the constables evicted the Murphys anyway. That denied the Murphys the benefit of a service, program, or activity that the constables provide: 24 hours' notice before an eviction. 25 Del. C. § 5715(b); *see, e.g.*, 28 C.F.R. § 35.130(b)(1)(ii) (prohibiting a public entity from affording a person with a disability "an opportunity to participate in or benefit from [a] . . . service that is not equal to that afforded others").[5] And because Murphy's disability was plausibly the only reason for the deprivation he suffered, the causation standards for the Title II and Section

---

[4] "This Court has not squarely addressed the question of whether claims may be brought against government officers in their individual capacities under Title II[.]" *Durham*, 82 F.4th at 224 n.12. Defendants do not dispute, however, that a public entity may be vicariously liable for its employees' conduct under Title II. We assume but do not decide such liability applies.

[5] *See also* 28 C.F.R. § 35.160(b)(1) ("A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including . . . members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."); *id.* § 35.104 ("Auxiliary aids and services includes . . . [q]ualified readers; taped texts; audio recordings; Brailled materials and displays . . . or other effective methods of making visually delivered materials available to individuals who are blind.").

504 claims have been met.  *See Haberle v. Troxell*, 885 F.3d 170, 179 (3d Cir. 2018); *Durham*, 82 F.4th at 226.

Likewise, the constables plausibly "failed to take certain pro-active measures to avoid the discrimination proscribed by Title II."  *Williams*, 117 F.4th at 528 (cleaned up).  Federal law required them to "make reasonable modifications" to "policies, practices, or procedures" when "necessary to avoid discrimination" based on disability.  28 C.F.R. § 35.130(b)(7)(i).  And they can only avoid doing so if they "demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id.*; *see also Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 118 (3d Cir. 2018) ("The reasonableness of an accommodation or modification is the same under the [Rehabilitation Act] and the ADA.").  At the pleading stage, the Murphy's complaint does not show that the constables have carried that burden.

Because the constables refused Murphy's request to stop the eviction when he had not been given notice in a form understandable to a person with blindness, the Murphys sufficiently alleged causation under both Title II and Section 504.  *See Durham*, 82 F.4th at 226 ("Refusing to make reasonable accommodations is tantamount to denying access.").

True, the Murphys have quoted the constables' statements that Murphy admitted his mother read an eviction notice to him that he discarded because it was not in his name.  At the pleading stage, however, the constables are not entitled to an inference that these parts of their statements are true.  Nor are they entitled to inferences that someone read the complete notice to Murphy, or that the person did so in a manner as effective as

8

a notice provided in a format understandable to a person with blindness. *See Uronis v. Cabot Oil & Gas Corp.*, 49 F.4th 263, 268 (3d Cir. 2022) (explaining that "[a]t the motion to dismiss stage, we . . . draw all reasonable inferences in favor of the non-moving party" (cleaned up)); *see also* 28 C.F.R. § 35.160(c)(2) (stating that generally, "[a] public entity shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication"). Lastly, the constables are not entitled to an inference that Murphy would not have taken action to avoid the eviction had they given him notice in a form understandable to a person with blindness. *See Uronis*, 49 F.4th at 268.

## C

The Murphys have not stated Section 1983 claims against Chief Magistrate Davis and the constables in their official capacities. The Murphys allege that these defendants maintain an "evict first, ask questions later" policy, as demonstrated by a supervisor having instructed the constables to evict the Murphys despite the deficient notice. But this single incident does not plausibly support an ongoing violation of federal law that could support a request for prospective relief. *See Merritts v. Richards*, 62 F.4th 764, 771–72 (3d Cir. 2023). The District Court properly dismissed these official-capacity claims.

By contrast, without developing a record, the Court cannot determine whether quasi-judicial immunity extends to the Murphys' individual-capacity Section 1983 claims

against the constables.[6]  Quasi-judicial immunity extends judicial immunity to certain actors "who perform functions closely associated with the judicial process."  *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991).  It can shield government actors "who serve as arms of the court, fulfilling a quasi-judicial role at the court's request."  *Russell v. Richardson*, 905 F.3d 239, 247 (3d Cir. 2018) (cleaned up).  But it "extends only to the acts authorized by court order, i.e., to the execution of a court order, and not to the manner in which it is executed."  *Id.* at 250.

In their individual-capacity Section 1983 claims, the Murphys assert that the constables did not provide them sufficient notice or opportunity to be heard before (1) depriving them of liberty and property interests in their home, and (2) seizing their home.  To the extent that the Murphys challenge the validity of the JP Court's writ of possession, quasi-judicial immunity would bar those claims.  *Id.* ("Quasi-judicial immunity extends . . . to the acts authorized by court order.").  But the Murphys also appear to challenge *when* the constables evicted them.  And, at this stage, we are unable to conclude that the constables lacked the discretion to postpone evicting the Murphys under circumstances presented here.  *See, e.g.*, *id.* at 251 (explaining that quasi-judicial immunity does not extend to officers' "inappropriate exercise" of their functions).  Accordingly, we will reverse the dismissal of these claims and remand for further proceedings in the District Court.  We do so without prejudice to any renewed presentation of the immunity defense after discovery.

---

[6] The Murphys have only pursued Section 1983 claims against Magistrate Davis in his official capacity.

\*      \*      \*

For the foregoing reasons, we will affirm in part, vacate in part, and reverse in part the District Court's order dismissing the Murphy's claims.  We will vacate the order insofar as it dismissed the Murphys' Title II and Section 504 claims.  We will reverse the order insofar as it dismissed the Murphys' Section 1983 claims against the constables in their individual capacities.  In all other respects, we will affirm the order.

MATEY, *Circuit Judge*, concurring in part and dissenting in part.

William Murphy and his family were improperly evicted. But responsibility rests with their landlord, not the State of Delaware or its officials. So while I join in full the majority's analysis affirming dismissal of the Murphys' official-capacity claims, I see no grounds for their other claims to proceed.

First, the Murphys failed to sufficiently plead causation for their claims under 42 U.S.C. §§ 12131–12165 and 29 U.S.C. § 794.[1] True, they alleged the denial of notice, a "benefit of a service, program, or activity that the constables provide." Maj. Op. at 8. But stating the substance of the law does not do. Missing from the complaint is anything more than conjecture that but for Murphy's blindness, he would have received notice before eviction.

Second, the Constables are immunized for "perform[ing] functions closely associated with the judicial process." *Russell v. Richardson*, 905 F.3d 239, 247 (3d Cir. 2018) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985)). Under Delaware law, constables are charged with executing all writs of possession and related court orders.[2] The Murphys allege the Constables should have provided notice, which speaks to the lawfulness of the order, not the Constables' actions. *See id.* at 251. The Majority reframes this as a "challenge [to] *when* the constables evicted them," Maj. Op. at 11, but that still pins liability to the execution of a facially valid court order. Meaning Murphys' claims

---

[1] *See Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 289–90, 291 n.25 (3d Cir. 2019).
[2] Del. Code Ann. tit. 10, § 2802(c) (2020); Del. Code Ann. tit. 25, § 5715(a) (2023).

1

target the Constables for their "fidelity to the specific [eviction] order," *Russell*, 905 F.3d at 250, the very kind of conduct protected by quasi-judicial immunity.

The Murphys' remedies rest against their landlord. So I would affirm the District Court's order in full.